Eckley *v.* Seese, Appellant.

Argued April 21, 1955. Before Stern, C. J., Stearne, Jones, Bell, Chidsey, Musmanno and Arnold, JJ.

426

*George T. Robinson,* for appellant.

*Forrest J. Mervine,* for appellees.

OPINION BY MR. JUSTICE BELL, June 27, 1955:

The sole question in this case is whether defendant is entitled to a judgment non obstante veredicto.

Darel Eckley, 3 1/2 years old, was killed in a heart-rending accident. At approximately 8:30 o'clock p.m., daylight saving time, on May 29, 1952, Mr. Eckley was driving his automobile on *a concrete paved highway* (18 feet wide) known as Route 209, in the Village of Brodheadsville, Monroe County, Pennsylvania. His wife was in the front seat of the four door sedan, Darel and his brother Dale, aged 8, were in the back seat of the car. * It was drizzling and the cars had their parking or low lights on at the time. Eckley said he was driving between 25 and 30 miles an hour. His son Dale suddenly said "The door" "Darel fell out". Eckley said "I stopped and looked back and seen him laying in the center of the road. He laid on his hands and on his knees. I seen a couple of cars coming [from the opposite direction] and put my hand out trying to slow them but couldn't. My wife jumped out of the car and I saw the car coming and I tried to stop the car. I seen it tried to straddle him

---

* It is unnecessary to decide whether this was such want of care as to constitute contributory negligence as a matter of law.

and seen he was trying to get up, and I don't know what happened."

Eckley first saw defendant's car when it was coming toward him about 200 to 250 feet away from him. Eckley estimated defendant was driving between 40 and 50 miles an hour and that he slowed down. There was a sign "35 mile speed limit". Eckley's car, going 25-30 miles an hour, traveled about 48 feet after he heard that Darel had fallen out. There were two cars in back of defendant and 2 or 3 in back of plaintiff.

Eckley further testified that defendant tried to straddle the boy and as he did so hit him with the bumper of his car and moved him about 15 feet. Defendant got down on his knees and pulled Darel by his legs out from under the car. *Darel was under the front axle, but so far as any evidence showed, had not been run over at any time by defendant's or any other car.* Eckley testified that he found some blood on the defendant's bumper guard and the reason he thought it was blood was that it looked red. On cross-examination Eckley admitted there was a steady flow of automobiles in both directions; that he never looked back at any time to see what position in his car his two boys were in; that the first time he knew about any danger was when his son Dale said "The door is open and Darel fell out"; that he did not continue to watch Darel but watched the traffic and put out his hand to flag the traffic; that he did not get out of his car because of approaching traffic, nor blow his horn, nor shout to defendant as defendant went by.

Eckley then made the following admissions: "Q. . . . Didn't the Seese car after it had passed you at any time block your vision of Darel's position on the highway? A. Well, after he had passed me; yes. After he had, there was a closing up. *After he got out about 8 or 10 feet, I couldn't see him.* Q. After? A. After

he passed. Q. After Mr. Seese passed you? A. I would say, about 15 feet; yes. Q. *You couldn't see Darel?* A. *I couldn't see Darel.* Q. *And you never saw him again until you saw him under the front axle of the car; is that right?* A. *That is right."* *

Mrs. Eckley testified as follows: "Q. Now, as you were riding west, will you tell the Court and jury what happened? A. Well, we just started out a short distance when the other boy shouted 'The door flew open. Darel fell out.' Q. What did your husband do and what did you do then? A. Well, he stopped as quick as he could. I got out of the car and first ran up to the front of the car and then ran up to the back. My intention was to stop the car. Q. What happened to you when you first stepped out of the car? A. Well, I slipped on the curb first and it slowed me up. Q. On the curb? A. On the side of the car. I had crepe sole shoes on and that is what made me slide. Q. Was the car fully stopped when you got out of the car? A. It really hadn't. Q. What happened? A. It throwed me down. I went down on my knee. I don't know which one. . . . A. I hollered, 'Don't run over him'. . . . Q. Would you know how far ahead it was when you first saw it? A. I would say, three car lengths. Q. In other words, you got out of your car, fell on your knee and got up, and when you saw this car it was about three cars in length ahead of you? A. Yes. . . . Q. And did the car pay any attention to you when you hollered? A. No. I don't know whether he heard me or not. . . . Q. Did you go back to Mr. Seese's car after it stopped? A. No; I didn't. . . . Q. Did you see them take the child out from under the car? A. No; I didn't. As I was coming up toward the car again, Mr. Seese came walking up.

---

* Italics throughout, ours.

He had him on his arm; on his shoulder like. Q. Where did he take him? A. He took him into the driveway; into the [doctor's] office. Q. And did you go along to the hospital with him? A. No; I didn't."

Dr. Martucci's house was about 600 feet away and defendant and Eckley took the boy to his office and then immediately to the Stroudsburg General Hospital, where Dr. Jordan, who was the chief surgeon in charge of the hospital, was summoned. Dr. Jordan testified that the boy had a fracture of the left femur and had multiple irregularities about his head, some due to hemorrhage between the skull, the skin and the scalp, and some due to fractures of the bone underneath. *". . . the whole skull was like a sponge . . . The whole skull was in many different pieces. . . .* he was in such severe shock." *The head and skull were crushed in many places.* The child was unconscious until his death seven days later.

The doctor further testified that the cause of his death was "The head injury and laceration of his brain"; and that the lacerations to the brain were caused by "multiple fractures of his skull, by tearing the brain and actually causing cuts in the brain . . ." The fractures were in the front and back and on top of his head. *There was no external bleeding*, according to the doctor, and the hospital records confirm him on this point. This was further confirmed by the testimony of the defendant and by the testimony of police officer Anthony Bensch, who arrived a few minutes after the accident and got down on his hands and knees and, with the aid of a flashlight, examined the bumper, the axle and other parts of defendant's car, and *found no blood of any kind and nothing to indicate the car struck the child.* After officer Bensch completed his examination of the car and the under parts of the car and the ground, he said, "Mr. Eckley, are you sat-

isfied this car didn't strike your child?", and he nodded his agreement.*

This was the plaintiff's case. It must be obvious to everyone that a little boy 3 1/2 years old, who fell out of an automobile which was going 25 to 30 miles an hour and landed *on a concrete highway,* would likely have exactly the injuries which Darel had.

Giving plaintiffs the benefit of all evidence favorable to them and assuming that defendant's car struck Darel and that defendant was negligent, *it is equally probable, if not more probable,* that the multiple fractures of Darel's head and brain were caused by his falling out of plaintiff's automobile *onto the concrete highway,* instead of being caused by defendant's bumper which would have likely caused a different kind of head injury.

" 'Plaintiff must prove by a fair preponderance of the evidence that defendant was guilty of negligence and that defendant's negligence was the proximate cause of the [injuries].' . . . 'It is not enough to show merely that an accident occurred, [or that plaintiff was injured] or that it [the injuries] *may have happened from any of several causes, equally probable,* for only one of which the defendant would be responsible; a jury cannot be allowed to find a verdict on the basis of a mere guess or conjecture; . . .' ": *Karcesky v. Laria,* 382 Pa. 227, 114 A. 2d 150.

---

* Seese also testified Eckley said at the time that he was satisfied Seese's car did not hit Darel. Seese's version of the accident differed from plaintiff's. Seese testified he was driving 20-30 miles per hour; he saw plaintiff's door fly open, an object hit the road and bounce twice; he put his brakes on and stopped as soon as possible; the first time he knew the object was a child was when he pulled the child out from under the front of his car; he was positive his automobile had not struck the child but that he stopped without striking him.

In the instant case Darel's injuries could with equal probability have been caused from falling out of his father's automobile *onto the concrete highway* or from being struck by defendant's automobile. There was no medical testimony produced to show that Darel's injuries were the result of being struck by defendant's automobile instead of the result of falling out of his father's car and bouncing on the highway, and consequently a verdict of a jury would be a mere guess or conjecture. For this reason, judgment is entered in favor of Travis J. Seese non obstante veredicto.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On the evening of May 29, 1952, Adam Eckley of Kresgeville, Pennsylvania, returned to his home after his day's work, ate his dinner, mowed the lawn and then, in accordance with a now well-established American custom, took his wife and small children out for an automobile ride. He drove several miles to Brodheadsville where at a roadside market he purchased flowers to take to the cemetery the following day, which was Memorial Day, and then started back for Kresgeville with his two small boys, Darel, 3 1/2 years of age, and Dale, aged 8, occupying the rear seat of the car with the flowers. While the car was travelling at a rate of 25 to 30 miles per hour, Dale cried out that his little brother Darel had fallen out of a suddenly-opened door. Eckley threw on his brakes and stopped within 48 feet of the spot where the child fell. At this moment, Eckley saw 200 to 250 feet away an automobile (later ascertained to be that of the defendant Travis J. Seese), approaching from the opposite direction and heading for the fallen child who on his hands and knees was trying to rise from the sur-

face of the road to which he had tumbled. Mrs. Eckley leaped from the car, waved her arms and screamed to Seese: "Don't run over him!" She continued this wailing entreaty as the Seese car bore down on the helpless lad.

A few moments later, both Eckley and Seese were extracting the unconscious and broken body of Darel Eckley from beneath the front axle of the defendant's car. The child's left leg was twisted and broken and his head was horribly crushed. Dr. C. G. Jordan testified that the cranium vault through the frontal, parietal and occipital areas had sustained such multiple fractures that "the whole skull was like a sponge." The child never recovered consciousness and died eight days later.

In the ensuing negligence action which the parents brought against the defendant Seese, the issue narrowed down to one proposition: Did Darel Eckley come to his death as the result of injuries sustained when he fell from his parents' car or was he killed by the defendant's car hitting him head-on and running over him? The jury found that Darel had been hit by the Seese car and it was this impact which visited death on the child. The case was well tried and the presiding judge submitted the issue of fact to the jury on a charge in which the defendant could possibly find no reason for fault. The Judge instructed the jury: ". . . if you believe from the evidence that his death was caused by his fall out of the car by hitting the road then, of course, you would stop right there and find for the defendant, because if you believe that his death was caused by his fall from the car and by hitting the road Mr. Seese would not be guilty of negligence, or if you are uncertain and cannot determine from the evidence whether he was killed by the fall on the road or by being hit by the car of the defendant then you

would find for the defendant, because you must find from the evidence before you find for the plaintiff that the child was killed by the car of Mr. Seese and by no other means."

During the jury's deliberation they asked for further instructions through their foreman who asked: "Your Honor, the jury would like to hear again the part of the charge to the jury which pertains to whether the jury is to decide whether the defendant's car was solely responsible for the death of the child?"

The Judge replied: "The Court: Yes. Unless the Seese car was solely responsible for the death of the child there would be no case. In other words, the action is brought against Mr. Seese to recover. Unless you find his car killed the child, there would be no liability on Mr. Seese. First, if you found that the child was killed by falling from the car, you would find for the defendant. If you could not determine what actually caused his death, whether falling from the car or being hit by the car, then you would have to find for the defendant. You cannot find for the plaintiffs unless you find this child was killed by the Seese car."

With this issue of fact having been squarely passed upon by the jury, the matter should be at an end. I see no justification for a judgment n.o.v. The Majority says: ". . . *it is equally probable, if not more probable,* that the multiple fractures of Darel's head and brain were caused by his falling out of plaintiff's automobile *onto the concrete highway,* instead of being caused by defendant's bumper which would have likely caused a different kind of head injury."

It is not for this Court to weigh probabilities. We have said countless times that an appellate court may reverse a plaintiff's verdict in a case of this kind only when it is *inconceivable* that the verdict may be rationalized on any reasonable hypothesis and this after weighing the evidence in the light most advantageous

to the plaintiff. With that kind of a criterion to guide us in reviewing the evidence here, it is simply contrary to human experience, as I view it, to say that it is inconceivable the accident could have happened in the manner described by the plaintiff's witnesses. In point of reality, it is inconceivable that it could have happened in any other way. Darel weighed only 40 pounds. The car in which he was riding was moving at the very conservative rate of from 25 to 30 miles per hour. The height of the floor of a Plymouth car to the ground is from 13 to 14 inches. Is it possible that with a slowly moving car a small body falling only 14 inches could be battered as Darel's was? Even if Darel fell on his head, it is to me incredible that such a fall would crush, mangle and pulverize the skull so as to reduce it to a sponge.

The human skull does not have the fragility of a cardboard container that can be crushed between the thumb and forefinger. It is built to withstand all the ordinary falls and blows that enter into nearly every healthy young person's life. The Creator built a strong box in which to store the jewel of the brain. Even at 3 1/2 years the bones of a boy have attained a durability that withstand a fall from heights considerably above 14 inches, a tripping down stairs, a tumble from roller skates. Without proof that Darel's skull was tissue paper thin, and there is no evidence that he was not a perfectly normal child, it is impossible to believe that with a fall of 14 inches, even from a moving object, his skull would be reduced to a parcel of bone fragments held together only by a net of cartilage, membrane and scalp. Especially is it impossible to accept this hypothesis when a perfectly natural explanation keeps knocking at the door of understanding for recognition. Why dispose of a case on a nebulous and attenuated hypothesis when we have the judgment of

twelve citizens tried and true who found, after considering all the evidence, that Darel's skull was cut to pieces because it was hit by a car travelling from 40 to 50 miles per hour?

Moreover, to accept the defendant's contention as to how the accident occurred is to introduce into the case an enigma which can have no possible solution. The defendant says that his car did not strike Darel. How then did the boy get under the car where he was found when it finally stopped? The axle of the defendant's car measures only 7 3/4 inches from the ground. How could the child have gotten under that axle without having been hit by it? Darel was 42 inches tall, and weighed 40 pounds. There is no possible position that his body could have taken that it would not have measured more than 7 3/4 inches tall. Moreover, we have the plaintiff's direct testimony that after Darel fell from the car he was "on his hands and legs," and with head raised, he was "trying to get up." On what imagined theory can it be argued that the car could pass over him while he was in this position and yet not strike him?

In addition, we have the positive testimony of Adam Eckley that he saw blood on the bumper. He also testified that just before the impact with the defendant's car, Darel's head was facing west, his feet pointed to the east. After the impact the child's body was found beneath the defendant's car with his head toward the south and his feet pointing north. If, as the defendant contends, the boy's skull was fragmentized by the simple fall of 14 inches to the road, he then would certainly have been unconscious from that moment and he could not have moved. The fact, however, is that the body did move. The fact is also that one leg was twisted and broken at a "rather peculiar angle," as testified to by the examining doctor, a re-

sult which would more readily come from being struck by an automobile rather than by a fall of 14 inches.

Police Officer Anthony Bensch, referred to by the Majority in its Opinion, did not examine the car at the scene of the accident, but at the hospital in East Stroudsburg some time after the accident. Although he testified that he did not find any evidence of blood on the car, he admitted that since the car had been driven in the rain from Brodheadsville to East Strouds-burg "it was possible it [the blood] could have been washed off." Furthermore, Bensch's examination of the car was a cursory one. His explanation for not taking the car to a garage hoist where it could have been examined with some care was that "it was just one of those things." He said that it was "just an accident" and made no further check. I submit that this is rather irresponsible and shaky evidence upon which to reverse the verdict of a jury which finds the testimony of the plaintiff's witnesses wholly credible and trustworthy.

The Majority quotes Eckley's testimony in which he said that after the defendant's car had passed him some 15 feet he (Eckley) did not see the boy on the road. But this testimony does not nullify his state-ment that the defendant's car struck Darel and moved him 15 feet. Eckley knew the exact location of the boy on the highway and he saw the defendant's car heading directly for him. If the boy's body, after the defendant's car came to a stop, was 15 feet beyond where it was seen immediately prior to the arrival of Seese's car at that point, the only possible conclusion, there having admittedly been no intervening cause, is that the Seese car pushed Darel 15 feet. In any event, any inconsistencies in the plaintiff's testimony were for the jury to consider and resolve. As was said in *Parker v. Matheson Motor Car Co.*, 241 Pa. 461, 466:

"In other words, the search for the truth did not develop such a conflict that a finding one way or the other would be a mere guess; it rather presented a condition of evidence, where, by making due allowances for the position of the witness and the form of the questions and answers on cross-examination, it was possible to harmonize apparently conflicting statements, and to draw justifiable inferences from the testimony as a whole. Upon this state of the evidence it was for the jury to say how they would find, . . ."

Seese was speeding at the rate of from 40 to 50 miles per hour in a zone restricted to 35 miles per hour. This in itself, if it was the proximate cause of the accident, constituted negligence. He was still 200 feet away from Darel when the child tumbled into the road. If Seese had been exercising the care required of him on the highway and had had his car under control, as the law requires him to have it under control, he could have stopped in time to avoid crushing the little body before him. His running down Darel under those circumstances is a clear case of negligence and the jury so found. I see no justification for reversing the verdict.